# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

Nº 10-cv-3509 (JFB) (ETB)

_____

## CHRISTOS ALEXIADIS,

Plaintiff,

VERSUS

## NEW YORK COLLEGE OF HEALTH PROFESSIONS, ET AL.,

Defendants.

_____

**MEMORANDUM AND ORDER**
September 20, 2012

_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Christos Alexiadis ("plaintiff" or "Alexiadis") brings this action against the New York College of Health Professions ("College"), Lisa E. Pamintuan ("Pamintuan"), Errol Virasawmi ("Virasawmi"), and Steven Haffner ("Haffner") (collectively, "defendants") alleging violations of Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112; Title III of the ADA, 42 U.S.C. § 12182; and the Rehabilitation Act, 29 U.S.C. § 794. Plaintiff also alleges the following state law claims: breach of contract, false arrest, false imprisonment, intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, violations of N.Y. Exec. Law § 296, violations of the New York State Constitution, and respondeat superior. In particular, plaintiff alleges that he is a disabled individual due to his HIV-positive status and related illnesses, and that he was arrested, suspended, and subsequently dismissed from the College as a consequence of his disability. Defendants contend that his arrest and dismissal from the College were not based upon his alleged disability, but rather were based upon his theft of a bag of hand sanitizer from a hallway dispenser outside of a classroom on July 31, 2009. Plaintiff counters that this purported reason was simply pretext in that he was bringing the hand sanitizer into the classroom so that students could use it before their lab session and, in his deposition, the professor confirmed that he saw plaintiff, on the day in question, sharing the hand sanitizer with other students.

Defendants move for summary judgment on the grounds that: (1) plaintiff's ADA Title I claim is unexhausted; (2) the adverse action here was not taken "because of" plaintiff's alleged disability; (3) plaintiff's

HIV-positive status does not qualify him as disabled under the ADA; and (4) even if plaintiff met his initial burden to present a *prima facie* case of discrimination, defendants have met their burden to show that plaintiff's dismissal was based upon legitimate, non-discriminatory grounds.

For the reasons set forth below, the Court holds that there is a genuine dispute as to material facts concerning (1) whether plaintiff is disabled within the meaning of the ADA; (2) whether defendants' actions were taken "because of" plaintiff's disabled status; and (3) whether defendants' explanation for their actions with respect to plaintiff was pretextual. Accordingly, the Court denies defendants' motion for summary judgment with respect to the public accommodation claim under Title III of the ADA, 42 U.S.C. § 12182; the claim under the Rehabilitation Act, 29 U.S.C. § 794; and the claim under N.Y. Exec. Law § 296. The Court grants defendants' motion for summary judgment on plaintiff's other state law claims.

## I. BACKGROUND

### A. Factual Background

The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the parties' respective Rule 56.1 Statements of Facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005). Unless otherwise noted, where a party's 56.1 Statement is cited, that fact is undisputed or

the opposing party has pointed to no evidence in the record to contradict it.[1]

### 1. Enrollment and Work-Study Experience

On December 10, 2008, plaintiff completed an application to enroll in the College's full-time Massage Therapy Program beginning in January 2009. (Defs.' 56.1 ¶ 1.) With his application, plaintiff enclosed a high school diploma from Belford High School. (Pl.'s 56.1 ¶ 2.) A valid high school diploma or equivalent qualification is a prerequisite for admission to the College, as well as a requirement to receive a massage therapy license from New York State. (Defs.' 56.1 ¶ 2.) Plaintiff believed the diploma to be valid at the time he submitted it to the College, but later learned, in 2010, that the diploma was not valid. (Pl.'s 56.1 ¶ 2.) Plaintiff was accepted as a student in the Massage Therapy Program at the College in December 2008 and began the process of enrollment in January 2009. (Pl.'s 56.1 ¶ 3, Defs.' 56.1 ¶ 3.)

Plaintiff applied for employment in the College's Financial Aid Department under the Federal Work-Study program, and was hired by the College as an Administrative Assistant in the Financial Aid Department on or about June 26, 2009, where he was paid ten dollars an hour. (Pl.'s 56.1 ¶ 4, Defs.' 56.1 ¶ 4.) Plaintiff's supervisor, an employee of the College, signed and approved his time sheet showing that he

---

[1] In addition, although the parties' Rule 56.1 Statements contain specific citations to the record to support their statements, the Court has cited to the Rule 56.1 Statements, rather than the underlying citation to the record, when utilizing the 56.1 Statements for purposes of this summary of facts.

worked in excess of twenty hours per week.[2] (Pl.'s 56.1 ¶ 4.) The College was not aware that plaintiff had submitted a resume containing false employment experience, as well as a false educational history. (Defs.' 56.1 ¶ 5.) Defendants contend that plaintiff submitted time sheets that showed that plaintiff was claiming to work when he was actually attending classes. (*Id.*) Plaintiff asserts, however, that the time sheets were signed and approved by the College and plaintiff had been excused from class or class had been cancelled on the days in question. (Pl.'s 56.1 ¶ 5.)

## 2. Plaintiff's Disclosure of His HIV-Positive Status

At the end of May and lasting into early June 2009, plaintiff suffered from a Staph infection, which caused him to be absent from several classes. (Defs.' 56.1 ¶ 6.) In early June 2009, plaintiff disclosed that he was HIV-positive to Stephanie Kraszewski ("Kraszewski"), the Director of Student Services, and to Haffner, then the Dean of Students and a professor.[3] (*Id.*) Defendants allege that plaintiff also disclosed his HIV-positive status to Dr. Richard Keohane ("Keohane"), plaintiff's Anatomy and Physiology Professor, in early June 2009. (*Id.*) Plaintiff contends that he disclosed his HIV-positive status to Keohane two to three months prior to June 2009. (Pl.'s 56.1 ¶ 6.)

---

[2] Defendants contend that plaintiff was limited to working twenty hours per week. (Defs.' 56.1 ¶ 4.)
[3] Haffner was appointed to the position of Dean of Students by Pamintuan, the President of the College. (Pl.'s Counter-Statement ("C.S.") 56.1 ¶ 2.) Haffner later became the Dean of the School of Massage Therapy, where he was in charge of setting the class schedule and overseeing faculty. (*Id.* ¶¶ 1, 3.) Keohane was promoted to Acting Dean of the School of Massage Therapy in January 2011. (*Id.* ¶ 12.)

Plaintiff alleges that, after he disclosed his HIV status to Haffner, Haffner stopped greeting plaintiff in the morning, which was contrary to how he treated plaintiff prior to learning of plaintiff's HIV status. (Pl.'s C.S. 56.1 ¶ 91.) Plaintiff also disclosed to Kristen Alexander ("Alexander"), his supervisor in the Office of Admissions, that he was HIV-positive after he returned from a two-week absence for a Staph infection. (*Id.* ¶ 88.) One week after plaintiff disclosed to Alexander and Haffner that he was HIV-positive, Mary Rodas ("Rodas"), the Director of Admissions, began slamming the door to her office while plaintiff was working in the office, began checking plaintiff's work-study hours, and made plaintiff sign a piece of paper saying he would not work in excess of ten hours. (*Id.* ¶ 93.) After plaintiff disclosed his HIV status to Haffner, plaintiff observed Haffner, Pamintuan (the President of the College), and Virasawmi (the Chief Financial Officer of the College) clustered together, on at least two or three occasions, making comments directed at plaintiff. (*Id.* ¶ 98.) Pamintuan's secretary also treated plaintiff very coldly and closed the office door on plaintiff when plaintiff went to give Pamintuan paperwork. (*Id.* ¶ 101.) Pamintuan gave plaintiff unpleasant looks when plaintiff dropped off paperwork. (*Id.* ¶ 102.) Haffner's demeanor changed after plaintiff disclosed his HIV status, becoming very cold and avoiding speaking to plaintiff. (*Id.* ¶ 103.)

## 3. Hand Sanitizer Incident

On July 30, 2009, during class, Keohane asked students to practice conducting palpitations on one another, and instructed the students to clean their hands, preferably with soap and water, but suggested hand sanitizer as an alternative. (Defs.' 56.1 ¶ 7, Pl.'s 56.1 ¶ 7.) Hand sanitizer was available

in the room, but the supply ran out while the students were cleaning their hands. (Defs.' 56.1 ¶ 7, Pl.'s 56.1 ¶ 7.)  Plaintiff went looking for hand sanitizer because he was not sure if a Staph infection he had contracted earlier was still contagious. (Pl.'s C.S. 56.1 ¶ 19.)  Plaintiff asserts that he asked Keohane if he could go get hand sanitizer, and Keohane granted him permission to do so. (*Id.* ¶ 20.) Keohane states that he gave students permission to leave the room to clean their hands, but he did not give permission to "break open a hand sanitizer and bring it into the classroom." (Pl.'s Ex. G, Keohane Deposition ("Keohane Dep.") at 67:15-68:6.) Plaintiff then went into the hallway and opened a wall-mounted hand sanitizer dispenser and removed one of the cartridges inside that contained the hand sanitizing liquid. (Defs.' 56.1 ¶ 8, Pl.'s 56.1 ¶ 8.) A surveillance camera recorded plaintiff opening the dispenser and removing the cartridge. (Defs.' 56.1 ¶ 8.) Plaintiff then returned to the classroom, where, plaintiff contends, he distributed the hand sanitizer amongst his classmates. (Pl.'s 56.1 ¶ 8.) Keohane, at his deposition, confirmed that plaintiff was sharing the hand sanitizer with students in the class. (Keohane Dep. at 62:7-13.)

On July 31, 2009, Virasawmi was informed by College security and maintenance staff that a student had been caught on videotape removing a cartridge of hand sanitizer from a wall dispenser. (Defs.' 56.1 ¶ 9, Pl.'s 56.1 ¶ 9.) After viewing the video from College security, Virasawmi called the Old Brookville Police Department to report the alleged theft. (Defs.' 56.1 ¶ 9, Pl.'s 56.1 ¶ 9.) Officers from the Old Brookville Police Department arrived at the College later that day and spoke to Virasawmi and Pamintuan, viewed two

pictures from the video of plaintiff by the hand sanitizer dispenser,[4] and requested to question plaintiff. (Defs.' 56.1 ¶ 10, Pl.'s 56.1 ¶ 10.) Haffner escorted the plaintiff to the office where the police officers were waiting, and the officers interviewed plaintiff. (Defs.' 56.1 ¶ 11.) The officers also spoke with Virasawmi and Pamintuan. (Defs.' 56.1 ¶ 11, Pl.'s 56.1 ¶ 11.) The police did not interview Haffner or Keohane. (Defs.' 56.1 ¶ 12, Pl.'s 56.1 ¶¶ 11, 12.) Defendants contend that plaintiff did not claim to the police, while he was being interviewed by the police at the College, that he had permission from Keohane to open the hand sanitizer cartridge. (Defs.' 56.1 ¶ 12.) According to the testimony of arresting officer Sergeant Thomas Egan ("Egan"), plaintiff told him at some point – either at the College or at police headquarters – that a teacher gave him permission to take the sanitizer. (Pl.'s Ex. I, Egan Deposition ("Egan Dep.") at 28:6-24.) Plaintiff was arrested and charged with petit larceny. (Defs.' 56.1 ¶ 13.) Plaintiff asserts that, prior to his arrest, Pamintuan insisted that plaintiff be arrested, whereas the police did not think an arrest was necessary over a five to ten dollar tube of hand sanitizer. (Pl.'s 56.1 ¶ 13.) Furthermore, according to the plaintiff, he told Egan that the defendants were charging him because of his HIV status. (*Id.*)

### 4. Plaintiff's Suspension and Review Process

On July 31, 2009, while plaintiff was being interviewed by the police officers, Haffner presented plaintiff with a

---

[4] Defendants state that the officers "viewed the videotape" of plaintiff opening the hand sanitizer dispenser, but plaintiff asserts that the officers saw only "two pictures from the video." (Defs.' 56.1 ¶ 10, Pl.'s 56.1 ¶ 10.)

suspension letter, dated July 31, 2009. (Defs.' 56.1 ¶ 14, Pl.'s 56.1 ¶ 14.) The letter stated that plaintiff had "displayed unprofessional conduct in violation of" the College's Code of Conduct, that the matter would be referred to the Committee on Academic Policy to consider, and that while the process was ongoing, plaintiff was suspended from the College and was not permitted on College property.[5] (Defs.' 56.1 ¶ 14.)

Generally, when a student was accused of a serious violation of the College's Code of Conduct, an incident report would be submitted by the accuser, an investigation would be conducted by Student Services, and then a Student-Faculty Committee meeting would be held. (Pl.'s C.S. 56.1 ¶ 25.) On August 5, 2009, the College's Student-Faculty Committee reviewed plaintiff's case. (Defs.' 56.1 ¶ 15.) Plaintiff was not permitted to attend the August 5, 2009 Student-Faculty Committee meeting, though, plaintiff contends, the College's policy allowed a student to respond to the discipline in front of the Student-Faculty Committee. (Pl.'s C.S. 56.1 ¶ 28, 30.)

The Committee consisted of students and faculty, and included Haffner and Kraszewski. (Defs.' 56.1 ¶ 15.) Plaintiff contends that Haffner voted on the disciplinary action, which defendants dispute. (Defs.' 56.1 ¶ 15, Pl.'s 56.1 ¶ 15.) The Committee considered incident reports submitted to the College by Haffner and a member of the College maintenance staff, the videotape of the hand sanitizer incident,

and the July 31, 2009 suspension letter provided to plaintiff. (Defs.' 56.1 ¶ 16, Pl.'s 56.1 ¶ 16.) According to plaintiff, no one at the Student-Faculty Committee Meeting presented plaintiff's explanation that he had permission from his professor to get the hand sanitizer and bring it back to class. (Pl.'s C.S. 56.1 ¶ 37.) The Committee unanimously voted to dismiss plaintiff from the college, with the opportunity to reapply after one trimester. (Defs.' 56.1 ¶ 16, Pl.'s 56.1 ¶ 16.) By letter dated August 6, 2009, the plaintiff was informed of the Committee's decision to dismiss him from the College and the basis for its actions. The letter also advised plaintiff of the process for applying for readmission after one trimester and that he was entitled to request that the College's Committee on Academic Policy conduct a review of the Committee's determination. (Defs.' 56.1 ¶ 17, Pl.'s 56.1 ¶ 17.) Plaintiff did not seek a review of the Committee's decision, or to reapply after one trimester, though plaintiff's psychotherapist called and left messages for Haffner to resolve the issue regarding the alleged theft. (Defs.' 56.1 ¶ 18, Pl.'s 56.1 ¶ 18.)

### 5. Incident of Alleged Theft Involving a Different Student

On February 23, 2009, the Old Brookville Police came to campus after a student attempted to steal in excess of $100,000 worth of checks from the Financial Aid Office. (Pl.'s C.S. 56.1 ¶ 60.) Pamintuan chose not to press charges. (*Id.*)

### B. Procedural Background

Plaintiff filed the complaint in this action on July 30, 2010. Defendants moved for summary judgment on December 21, 2011. Plaintiff filed a response in opposition to the

---

[5] The letter stated that plaintiff was "not allowed to attend class or be on the College campus without written authorization" from Haffner. "If you see the student in class or on campus please notify the Office of Student Services AND security immediately." (Pl.'s C.S. 56.1 ¶ 33.)

motion for summary judgment on March 16, 2012. Defendants replied on March 30, 2012. The Court held oral argument on the motion on April 4, 2012. The Court has fully considered the arguments and submissions of the parties.

## II. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct.

2505, 91 L. Ed. 2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (emphasis in original)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S. Ct. 2505 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48, 106 S. Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

The Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g., Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)).

### III. DISCUSSION

#### A.    Applicable Law

The ADA was enacted by Congress to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities[.]" 42 U.S.C. § 12101(b)(1). Title I of the ADA prohibits employment discrimination. *See* 42 U.S.C. § 12112. Title II prohibits disability discrimination by public entities in connection with access to public services. *See* 42 U.S.C. § 12132. Under Title III, the provision at issue, "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182. The statute provides a list of private entities that are defined as places of public accommodation, including, for example, hotels, theaters, grocery stores, and transportation centers. 42 U.S.C. § 12181(7). Schools, including "elementary, secondary, undergraduate, or postgraduate private school[s], or other place[s] of education" are defined as places of public accommodation. 42 U.S.C. § 12181(7)(J).

In order to establish a *prima facie* case under Title III of the ADA, a plaintiff must establish the following: (1) that he is disabled within the meaning of the ADA; (2) that defendants own, lease, or operate a place of public accommodation; and (3) that defendants discriminated against the plaintiff by denying him a full and equal opportunity to enjoy the services defendants provide. *See Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 368 (2d Cir. 2008); *Camarillo v. Carrols Corp.*, 518 F.3d 153, 156 (2d Cir. 2008).[6]

---

[6] Plaintiff concedes that he failed to exhaust his administrative remedies before filing this action. Accordingly, his claims for employment discrimination pursuant to Title I of the ADA, 42 U.S.C. § 12112, and the Rehabilitation Act, 29 U.S.C. § 794, are dismissed. Instead, plaintiff brings his claim of discrimination in public accommodation under Title III, which does not require administrative exhaustion. *See McInerney v. Rensselaer Polytechnic*

B. Whether Plaintiff is Disabled

A threshold issue is whether plaintiff sufficiently alleges that he was disabled within the meaning of the ADA. For the reasons set forth below, this Court concludes that plaintiff has raised a genuine dispute as to material facts concerning whether he is disabled under the ADA.

The ADA defines a disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1). With respect to an individual who is "regarded as having an impairment" under 42 U.S.C. § 12102(1)(C), the individual must establish "that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to

_____

*Inst.*, 505 F.3d 135, 138 (2d Cir. 2007). It is well-settled that the the three-part burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973) ("*McDonnell Douglas*") applies to employment discrimination cases brought under Title I of the ADA. In the motion papers in this case, both sides utilize the *McDonnell Douglas* framework to analyze the Title III discrimination claim. (*See* Defs.' Mot. for Summary Judgment ("Defs.' Mot.") at 14-15, Dec. 21, 2011, ECF No. 30; Pl.'s Opp. to the Mot. for Summary Judgment ("Pl.'s Opp.") at 20-21, Mar. 16, 2012, ECF No. 35.) Although the Second Circuit has never decided whether *McDonnell Douglas* should also be utilized for Title III claims, this Court concludes that, given the nature of the claims in this case (namely, termination from a work-study position, and suspension and dismissal from the College because of a disability), and given that the parties both apply the framework, it is appropriate to use the framework here. In any event, the Court's decision would be the same even without utilization of the *McDonnell Douglas* framework.

limit a major life activity." 42 U.S.C. § 12102(3)(A). However, paragraph (1)(C) "shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B).

Congress enacted the ADA Amendments Act of 2008 ("ADAAA"), effective January 1, 2009, which expanded the class of individuals entitled to protection under the ADA. Pub. L. No. 110-325, 122 Stat. 3553 (2008). As the Ninth Circuit has explained:

> In the ADAAA, Congress emphasizes that when it enacted the ADA in 1990, it "intended that the Act 'provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities' and provide *broad* coverage." The ADAAA rejects the Supreme Court's interpretation of the term "disability" in *Sutton v. United Air Lines, Inc*., 527 U.S. 471, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999), and *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002), and thereby expands the class of individuals who are entitled to protection under the ADA.

*Rohr v. Salt River Project Agric. Improvement & Power Dist*., 555 F.3d 850, 853 (9th Cir. 2009) (citations omitted).

The ADAAA clarified the definition of "major life activities" in 42 U.S.C. § 12102(1)(A). Specifically, as relevant to this case, post-ADAAA, "a major life activity also includes the operation of a major bodily function, including but not

limited to, functions of the immune system." 42 U.S.C. § 12102(2)(B). Furthermore, "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D). Additionally, one of Congress's purposes in enacting the ADAAA was "to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." 122 Stat. 3554.

Viewing the evidence in the light most favorable to plaintiff, including drawing all reasonable inferences in plaintiff's favor, a rational factfinder could conceivably conclude that plaintiff's HIV-positive status substantially limits the major life activity of the function of his immune system.[7]

Plaintiff was diagnosed as HIV-positive several years before enrolling in the College. (Pl.'s Ex. A, Plaintiff's Deposition ("Pl.'s Dep."), 118:16-18.) The record in this case contains evidence that plaintiff suffered from various ailments during his time at the College. For example, plaintiff experienced a Staph infection that began at the end of May and lasted until early June 2009, which caused him to go to the emergency room and to miss several classes. (Defs.' 56.1 ¶ 6.)[8] Plaintiff also testified that he broke his ribs at one point while he was a student at the College, and that he told Keohane that it will "take a little longer for me to heal because I do have HIV." (Pl.'s Dep. at 137:23-25.)

---

[7] Prior to the passage of the ADAAA, in *Bragdon v. Abbott*, 524 U.S. 624, 641 (1998), the Supreme Court held that the respondent's HIV infection was a disability under 42 U.S.C. § 12102(1)(A) because it "substantially limits [the] major life activity" of reproduction. The Court did not address whether HIV infection is a *per se* disability under the ADA. *Id.* at 642. In *Teachout v. N.Y. City Dep't of Educ.*, 04 Civ. 945 (GEL), 2006 U.S. Dist. LEXIS 7405 (S.D.N.Y. Feb. 27, 2006), plaintiff claimed that his HIV-positive status substantially limited the major life activity of reproduction. *Id.* at *23. Because HIV has not been held to be a disability *per se*, the court undertook a "case-by-case inquiry as to whether a plaintiff's HIV infection substantially affects *plaintiff's* ability to reproduce." *Id.* at *23-24 (emphasis in original). The court concluded that plaintiff's ability to reproduce was substantially limited by his HIV-positive status, since the record contained no evidence that plaintiff had any other condition limiting his ability to reproduce, and plaintiff's partner had submitted an affidavit stating that they "began to talk about having a child." *Id.* at *27. That statement and the lack of evidence pointing to any alternative inability to reproduce was sufficient to "create an issue of fact regarding the [e]ffect of plaintiff's HIV infection on the major life activity of reproduction." *Id.* Similarly, in *Lederer v. BP Prods. N. Am.*, 04 Civ. 9664, 2006 U.S. Dist.

LEXIS 87368, at *15 (S.D.N.Y. Dec. 1, 2006), the court found that the HIV-positive plaintiff had raised a genuine issue of material fact as to whether HIV substantially limited his ability to reproduce to preclude summary judgment on the issue of whether plaintiff was disabled for purposes of the ADA. In the instant action, however, plaintiff has not alleged that his HIV status affected his ability to reproduce, and the Court's conclusion concerning whether plaintiff is disabled is premised on plaintiff's assertions concerning his immune system, not on whether plaintiff's ability to reproduce was impaired.

[8] Plaintiff may also have experienced Staph infections in April 2009 and October 2009. (Pl.'s Ex. II, Budney Deposition ("Budney Dep."), at ECF Page No. 112-13.) Furthermore, plaintiff's psychotherapist was questioned concerning plaintiff's health as a consequence of his HIV-positive status. "I am not an expert on stress affected to HIV illness, but in my opinion and my experience with [plaintiff], when he is going through a lot of stress it impacts him physically. He gets diarrhea or he gets sick or . . . he will have headaches, he won't be able to sleep." (*Id.*) She noted, however, that she did not speak to any medical doctors about "what impact, if any, the stress was having on his HIV status." (*Id.* at 113.) She opined that the chronic stress may have played a role in plaintiff's hospitalization for a severe Staph infection on October 6, 2009. (*Id.*) She also stated, "when he is under a lot of stress and strain or when his interpersonal life is not going well, it would lower his immune system or he might tend to get more sick, physically sick." (*Id.*)

Finally, plaintiff testified that he told Kraszewski about his HIV status after he had missed class because he wasn't "feeling well," and had learned that his T-cell "levels had dropped" and he was "becoming ill with the HIV infection," which meant that he would need to start a treatment regimen. (Pl.'s Dep. at 142:9-18.)

This evidence concerning plaintiff's hospitalizations due to Staph infections, plaintiff's difficulty recovering from injuries, and plaintiff's T-cell levels is sufficient to create a disputed issue of fact as to whether plaintiff is disabled within the meaning of the ADA. *See Horgan v. Simmons*, No. 09 C 6796, 2010 U.S. Dist. LEXIS 36915, at *9 (N.D. Ill. Apr. 12, 2010) ("Drawing all inferences in Plaintiff[']s favor, it is certainly plausible – particularly, under the amended ADA – that Plaintiff's HIV-positive status substantially limits a major life activity: the function of his immune system."); *cf. Baptista v. Hartford Bd. of Educ.*, 427 F. App'x 39, 42 (2d Cir. 2011) ("But while [appellant] conclusorily alleges that his firing constituted discrimination on the basis of his alcoholism or HIV-positive status, in none of his complaints did he describe how either impairment limited any major life activity.").[9] In other words, a rational

factfinder, construing the evidence in the light most favorable to plaintiff, could conclude that plaintiff's HIV-positive status constituted a disability because it substantially limited the major life activity of the function of his immune system. *See* 42 U.S.C. §§ 12102(1)(A), 12102(2)(B).[10]

C. Whether Arrest and Dismissal Were "Because of" Disability

Defendants argue that Pamintuan and Virasawmi had no knowledge of plaintiff's HIV-positive status at the time of plaintiff's dismissal, and that there is no evidence from which it could be reasonably inferred that the defendants took the adverse actions "because of" plaintiff's HIV-positive status. (Defs.' Mot. at 15.) This Court concludes, however, that a rational factfinder could find that the individuals responsible for the adverse actions against plaintiff were aware of his HIV-positive status.

According to plaintiff's evidence, in early June 2009, plaintiff disclosed that he was HIV-positive to Kraszewski,[11] the Director of Student Services, and to Haffner, then the Dean of Students and a professor. (Defs.' 56.1 ¶ 6.) Plaintiff also disclosed his HIV-positive status to Keohane, either in

[9] The Court notes that this conclusion – namely, that there is sufficient evidence in the record from which a rational factfinder could conclude that the function of plaintiff's immune system may have been substantially limited by his HIV status – is consistent with the Equal Employment Opportunity Commission regulations to implement the equal employment provisions of the ADA, which state, "it should easily be concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated: . . . Human Immunodeficiency Virus (HIV) infection substantially limits immune function." 29 C.F.R. § 1630.2.

[10] Additionally, there is a disputed issue of material fact as to whether plaintiff was "regarded as" disabled under 42 U.S.C. § 12102(1)(C). As discussed *infra*, construing all facts in the plaintiff's favor, plaintiff's supervisors treated him differently after learning that he had a Staph infection and after he advised them of his HIV status. A rational factfinder could conclude that their actions demonstrate that they believed plaintiff was significantly impaired, such that he was regarded by them as disabled (as that term is defined under the ADA).
[11] Kraszewski does not recall plaintiff disclosing his HIV-positive status to her. (Defs.' Ex. N, Kraszewski Deposition ("Kraszewski Dep."), 57:24-58:17.)

June 2009, (Defs.' 56.1 ¶ 6.), or two to three months prior to June 2009 (Pl.'s 56.1 ¶ 6.). Additionally, plaintiff disclosed to Alexander, his supervisor in the Office of Admissions, that he was HIV-positive after he returned from a two-week absence for the Staph infection. (Pl.'s C.S. 56.1 ¶ 88.)

One week after plaintiff disclosed to Alexander and Haffner that he was HIV-positive, Rodas, the Director of Admissions, began slamming the door to her office while plaintiff was working in the office, began checking plaintiff's work-study hours, and made plaintiff sign a piece of paper saying he would not work in excess of ten hours. (*Id.* ¶ 93.) According to plaintiff, plaintiff had previously been permitted to work as many hours as he wanted to. (Pl.'s Dep. 122:7-15, 151:21-24.)

Plaintiff also asserts, under oath, the following:  (1) after plaintiff disclosed his HIV status to Haffner, on at least two or three occasions, plaintiff observed Haffner, Pamintuan, and Virasawmi clustered together making comments directed at plaintiff (Pl.'s C.S. 56.1 ¶ 98); (2) Pamintuan's secretary also treated plaintiff very coldly and closed the office door on plaintiff when plaintiff went to give Pamintuan paperwork (*Id.* ¶ 101); (3) Pamintuan gave plaintiff unpleasant looks when plaintiff dropped off paperwork (*Id.* ¶ 102); and (4) Haffner's demeanor changed after plaintiff disclosed his HIV status, becoming very cold and avoiding speaking to plaintiff. (*Id.* ¶ 103.)[12]

---

[12] Pamintuan states in her declaration that the first time she became aware of the claim of discrimination based on HIV status by plaintiff was when a local newscaster attempted to contact her for a comment regarding plaintiff's claims. (Defs.' 56.1 ¶ 19, Pl.'s 56.1 ¶ 19.)

This evidence is sufficient to create a disputed issue of material fact as to whether Pamintuan and Virasawmi were aware of plaintiff's HIV-positive status and engaged in the adverse actions against him because of that status.

### D. Whether Plaintiff Has Shown Defendants' Explanation to be Pretextual

Plaintiff argues that he has met his burden to show that defendants' proffered reason for having him arrested, suspended, and dismissed was pretextual. The Court concludes that there are genuine issues of material fact in dispute concerning whether defendants' explanation was a pretext for disability discrimination.

Defendants argue that the reason for plaintiff's arrest and suspension is that he was observed on videotape stealing hand sanitizer. According to defendants, when plaintiff was given the opportunity to explain his actions, he admitted to taking the cartridge. Moreover, defendants contend that plaintiff never told the defendants that he had permission from Keohane to take the hand sanitizer, and in fact, only offered that explanation when he was taken to the police station. Indeed, Keohane denies giving the plaintiff permission to break open the sanitizer cartridge. Additionally, plaintiff never appealed the College Committee's decision, and never informed the College of his belief that he had been treated in a discriminatory manner.

In an effort to show pretext, plaintiff points, in part, to the defendants' alleged failure to give him a sufficient opportunity to respond to the allegations against him, as well as defendants' failure to thoroughly investigate the incident. For example, Keohane, at his deposition, confirmed that

plaintiff was sharing the hand sanitizer with students in the class. (Keohane Dep. 62:7-13.) However, there is no evidence that anyone consulted with Keohane before suspending plaintiff. On those issues, the Court emphasizes that a person's disagreement with the thoroughness of an investigation is not, in and of itself, sufficient to demonstrate discriminatory intent. *See Rorie v. United Parcel Serv., Inc.*, 151 F.3d 757, 761 (8th Cir. 1998) (stating that "the relevant inquiry was whether [plaintiff] created a genuine issue of material fact as to whether her discharge was gender-based and not whether her termination was reasonable" and noting that "[i]t is not the task of this court to determine whether [the investigator's] investigation was sufficiently thorough or fair"); *Sharpe v. Utica Mut. Ins. Co.*, 756 F. Supp. 2d 230, 250 (N.D.N.Y. 2010) (citing *Rodriguez v. City of N.Y.*, 644 F. Supp. 2d 168, 187 (E.D.N.Y. 2008) ("[T]he fact that an employee disagrees with the results of an employer's decision regarding termination, or even has evidence that the decision was objectively incorrect or was based on faulty investigation, does not automatically demonstrate, by itself, that the employer's proffered reasons are a pretext for termination.")). However, plaintiff points to other categories of actions, that, when viewed collectively in the light most favorable to plaintiff, raise a genuine disputed issue of fact as to whether defendants' actions were pretextual.

As discussed above, one week after plaintiff disclosed his HIV-positive status to Haffner and Alexander, plaintiff's supervisor Rodas allegedly began slamming the door to her office while plaintiff was working in the office. (Pl.'s C.S. 56.1 ¶ 93.) Plaintiff also observed Haffner, Pamintuan, and Virasawmi allegedly clustered together

making comments directed at plaintiff. (*Id.* ¶ 98.) Pamintuan's secretary allegedly treated plaintiff very coldly and closed the office door on plaintiff when plaintiff went to give Pamintuan paperwork. (*Id.* ¶ 101.) Pamintuan allegedly gave plaintiff unpleasant looks when plaintiff dropped off paperwork. (*Id.* ¶ 102.) Haffner's demeanor also allegedly changed after plaintiff disclosed his HIV status, becoming very cold and avoiding speaking to plaintiff. (*Id.* ¶ 103.)

Additionally, according to plaintiff, Rodas began checking plaintiff's work-study hours, and made plaintiff sign a piece of paper saying he would not work in excess of ten hours. (*Id.* ¶ 93.) Plaintiff testified that, previously, plaintiff had been permitted to work as many hours as he wanted to. (Pl.'s Dep. 122:7-15, 151:21-24.) Plaintiff acknowledges that the Financial Aid Director, Luis Gauman, told plaintiff two weeks after plaintiff started working, that there was a limit on hours, but "he [Gauman] said don't worry about it." (*Id.* 152:2-6.) Although plaintiff had signed a Federal Work-Study Contract limiting his hours to 20 hours per week, he said the rule was not enforced. (*Id.* 152:13-21, 153:11-14.) Indeed, in a nine-day period from June 30 to July 9, 2009, plaintiff worked 53 hours, which plaintiff testified was typical of the number of hours he worked. (*Id.* 156:16-157:6.) After plaintiff revealed his HIV-positive status, the Office of Admissions limited his hours to ten per week. (Pl.'s C.S. 56.1 ¶ 10.) At oral argument, the Court asked defendants for an explanation concerning the sharp reduction in plaintiff's hours, and defendants responded that the College was merely enforcing the 20-hour maximum mandated for participants in the Federal Work-Study program. Defendants did not, however, provide any explanation

contained in the record for why that limit was not enforced prior to plaintiff's disclosure of his HIV-positive status.

Moreover, plaintiff has proffered evidence that a student who was not HIV-positive and who attempted to steal items from the College was treated differently than plaintiff. Specifically, on February 23, 2009, the Old Brookville Police came to campus after a student attempted to steal in excess of $100,000 worth of checks from the Financial Aid Office. (*Id.* ¶ 60.) Unlike in plaintiff's case, Pamintuan chose not to press charges. (*Id.*) Defendants argue that plaintiff was not similarly situated to the other student because "it involved a student who lost his temper in the Financial Aid Office, picked up a stack of checks and had to be physically restrained by a College employee." (Defs.' Reply in Support of Mot. for Summary Judgment ("Defs.' Reply") at 10, Mar. 30, 2012, ECF No. 37.) Defendants further contend that, prior to plaintiff's alleged theft, there was "a long string of thefts that had been plaguing the campus for an extended period." (*Id.*) However, the Court concludes that, in this case, the fact-specific question of whether these students were similarly situated, and whether the differing treatment supports a reasonable inference of disability discrimination, cannot be decided on summary judgment and should be left to the jury. *See generally Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) ("Whether two employees are similarly situated ordinarily presents a question of fact for the jury."); *accord Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir. 2001) (same).

Thus, plaintiff asserts, *inter alia*, that: (1) College employees' attitudes towards the plaintiff changed significantly after he disclosed his HIV-positive status; (2)

plaintiff's supervisors began enforcing a limit on plaintiff's hours after he disclosed his HIV-positive status, whereas he had previously been permitted to work unlimited hours; and (3) the College did not arrest a non-HIV-positive student who attempted a serious theft on campus. Drawing all reasonable inferences in the plaintiff's favor, these assertions, collectively, are sufficient to create an issue of disputed fact as to whether defendants' actions were the result of plaintiff's disability or perceived disability. Accordingly, the Court denies defendants' motion for summary judgment on the claim under Title III of the ADA, 42 U.S.C. § 12182 and the claim under the Rehabilitation Act, 29 U.S.C. § 794.[13]

Finally, the Court denies defendants' motion for summary judgment with respect to certain categories of damages – namely, front pay, reinstatement, a degree from the College, or lost wages. Defendants argue that plaintiff cannot obtain these forms of relief because of "after acquired evidence" which defendants contend demonstrates,

---

[13] Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Apart from some subtle differences between the ADA and the Rehabilitation Act that are not dispositive here, "the reach and requirements of both statutes are precisely the same." *Weixel v. Bd. of Educ. of N.Y.*, 287 F.3d 138, 146 n.5 (2d Cir. 2002); *see Henrietta D. v. Bloomberg*, 331 F.3d 261, 291 (2d Cir. 2003). Accordingly, the Court denies summary judgment on the claim of discrimination in public accommodation under the Rehabilitation Act for the same reasons that the Court denies summary judgment on the ADA claim. Similarly, the Court also denies summary judgment on the N.Y. Exec. Law § 296 claim for the same reasons that the Court denies summary judgment on the ADA claim.

*inter alia*, that plaintiff made false statements to the College about his educational background and submitted false billing for student work. However, plaintiff disputes much of this evidence, including denying that he made statements about attending Mercy College and denying that he falsely billed hours. (Pl.'s 56.1 ¶¶ 2, 5.)[14] In any event, it is unclear from the record exactly how each of these pieces of evidence, even if proven, would have impacted plaintiff's eligibility for admission or continuing enrollment at the College.[15] The Court concludes, given the factual disputes surrounding the after acquired evidence and the disputes about its potential impact on plaintiff's attendance at the College, that these damages issues also cannot be resolved on summary judgment. *See, e.g., Smith v. Tuckahoe Union Free Sch. Dist.*, No. 03 Civ. 7951 (PGG), 2009 U.S. Dist. LEXIS 91106, at *39 (S.D.N.Y. Sept. 30, 2009) ("Summary judgment on this issue [of after acquired evidence] 'is inappropriate' where the plaintiff 'raise[s] a material issue of fact as to whether the after-acquired evidence would actually be a basis for termination.'" (quoting *Greene v. Coach, Inc.*, 218 F. Supp. 2d 404, 413 (S.D.N.Y. 2002))); *see also Flores v. Buy, Buy Baby, Inc.*, 118 F. Supp. 2d 425, 433 (S.D.N.Y. 2000) ("There remain material issues of relevant fact as to whether [the employer] would have fired [the plaintiff] solely on the basis of her falsified employment

application. Defendant's motion to strike plaintiff's claim for front pay and reinstatement is therefore denied.").

### E. State Law Claims

#### 1. False Arrest and False Imprisonment

Plaintiff's claims for false arrest and false imprisonment fail because defendants, as private individuals and entities, cannot be held liable for plaintiff's arrest by the Village of Old Brookville police officers because the officers had probable cause to arrest plaintiff for petit larceny, and there is no allegation that defendants knowingly provided false information to the police concerning plaintiff's actions.

The Second Circuit has established that "[t]he existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.'" *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)). "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* Furthermore, "[t]he validity of an arrest does not depend upon an ultimate finding of guilt or innocence." *Peterson v. Cnty. of Nassau*, 995 F. Supp. 305, 313 (E.D.N.Y. 1998) (citing *Pierson v. Ray*, 386 U.S. 547, 555 (1967)). "Rather, the court looks only to the information the arresting officer had at the time of the arrest." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). Moreover, the "question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to

---

[14] Plaintiff also asserts, "Tellingly, Defendants did not make any accusations regarding alleged issues with Plaintiff's Work-Study time sheets for over a year after his arrest until at least August 2, 2010, after the criminal case had been dismissed in favor of [Plaintiff]." (Pl.'s Opp. at 5 n.1.)

[15] For example, with respect to the issue with plaintiff's high school diploma, it is unclear whether it could have been corrected while plaintiff continued to attend classes at the College.

the pertinent events and the knowledge of the officers." *Weyant*, 101 F.3d at 852.

The arresting officer, Sergeant Egan, "thought we had enough for an arrest at that time." (Egan Dep. 46:8-9.) He viewed surveillance pictures showing plaintiff taking the hand sanitizer. (*Id.* 24:23-25:8.) When Egan asked plaintiff what happened, plaintiff "really didn't reply." (*Id.* 25:14-15.) Egan also spoke to Virasawmi, who said that the plaintiff did not have permission to take the hand sanitizer. (*Id.* 28:17-24, 45:19-21). There is no allegation that Virasawmi knew or believed that plaintiff had permission to take the sanitizer, thus plaintiff does not allege that Virasawmi knowingly provided false information to the police. Instead, plaintiff suggests that Virasawmi failed to conduct a thorough investigation by, among other things, checking with Keohane to verify the plaintiff's version of events. (*See* Pl.'s Opp. at 7 ("[N]either the police nor Defendants Virasawmi or Haffner sought Dr. Keohane or any students who had been in the class room on July 30, 2009, to verify Plaintiff's version of events.").) However, the mere failure to investigate does not provide a basis for false arrest, whether the failure to investigate is on the part of the police or, as in this case, on a private individual allegedly acting in concert with the police by providing information to the police. *See Ricciuti v. N.Y. City Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997) ("Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore or eliminate every theoretically plausible claim of innocence before making an arrest."); *see also Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) ("Although a better procedure may have been for the officers to investigate plaintiff's version of events more completely, the arresting officer does not

have to prove plaintiff's version wrong before arresting him."); *compare Weintraub v. Bd. of Educ. of N.Y.*, 423 F. Supp. 2d 38, 55-56 (E.D.N.Y. 2006) (denying summary judgment where "[plaintiff] complain[ed] that the defendants instigated the arrest, and did so based on facts that they knew were false."). In short, given that there is no allegation or evidence that any of the named defendants knew that the information being provided to the police was false, and given that the evidence supplied to the police (including the surveillance photographs) was sufficient to establish probable cause for the theft, the false arrest and false imprisonment claims fail as a matter of law. Accordingly, the Court grants summary judgment to defendants on plaintiff's false arrest and false imprisonment claims.[16]

### 2. Breach of Contract

Plaintiff alleges that defendants breached a contract with plaintiff by depriving him of an opportunity to address the circumstances surrounding his theft before the Student-Faculty Committee and by failing to provide him with a hearing before the Committee on Academic Policy. This claim must fail.

---

[16] Plaintiff additionally alleges negligence against defendants Pamintuan, Virasawmi, and Haffner for "carelessly and recklessly" procuring plaintiff's arrest, seizure, and detention. (Complaint ¶ 106, July 30, 2010, ECF No. 1.) Thus, plaintiff seeks damages for injury resulting from his allegedly false arrest and detention. It is well-settled under New York law that, where a plaintiff seeks damages for "injury resulting from false arrest and detention," he "cannot recover under broad general principles of negligence but, instead, must proceed by way of the traditional remedy of false arrest." *Santoro v. Town of Smithtown*, 40 A.D.3d 736, 738 (N.Y. App. Div. 2007). Accordingly, the Court grants summary judgment to defendants on plaintiff's negligence claim.

"The elements of a breach of contract claim in New York are: (1) the existence of a contract, (2) performance by the party seeking recovery, (3) non-performance by the other party, and (4) damages attributable to the breach." *Kramer v. New York City Bd. of Educ.*, 715 F. Supp. 2d 335, 356 (E.D.N.Y. 2010) (quoting *RCN Telecom Servs., Inc. v. 202 Centre St. Realty LLC.*, 156 F. App'x 349, 350-51 (2d Cir. 2005)). The defendants' handbook did not provide any "right" to a hearing before the Student-Faculty Committee. (Defs.' Ex. X, New York College of Health Professions, Student Handbook, Spring 2009.) The handbook is silent on that issue. In any event, it is uncontroverted that defendants did, in fact, provide plaintiff with an opportunity to contest the charges against him by allowing him to request that the College's Committee on Academic Policy review the decision of the Student-Faculty Committee, but plaintiff did not avail himself of this opportunity. (Defs.' Ex. Y, Letter from Kraszewski to Pl., Aug. 6, 2009.) Thus, given the uncontroverted evidence, no rational jury could conclude (1) that there was a contract, or (2) that there was non-performance by the defendants under any alleged contract. Accordingly, the Court grants summary judgment to defendants on the breach of contract claim.[17]

---

[17] Additionally, plaintiff argues that defendants have breached a contract with plaintiff by violating anti-discrimination provisions in the Student Handbook. (Pl.'s Opp. at 22.) This claim fails because "it is well-established that an employer's anti-discrimination policies and manuals cannot serve as the basis for a breach of contract claim." *Price v. Cushman & Wakefield, Inc.*, 808 F. Supp. 2d 670, 700 (S.D.N.Y. 2011) (quotations omitted) (collecting cases).

### 3. Negligent Infliction of Emotional Distress

A claim of negligent infliction of emotional distress "may only proceed where the allegations of conduct are 'so extreme in degree and outrageous in character as to go beyond all possible bounds of decency, so as to be regarded as atrocious and utterly intolerable in a civilized community.'" *Wilson v. City of New York*, 294 A.D.2d 290, 295, 743 N.Y.S.2d 30, 34 (N.Y. App. Div. 2002) (quoting *Wolkstein v. Morgenstern*, 275 A.D.2d 635, 636-37, 713 N.Y.S.2d 171, 172 (N.Y. App. Div. 2000) (internal quotations omitted)). Moreover, "'[i]n the absence of contemporaneous or consequential physical injury, courts have been reluctant to permit recovery for negligently caused psychological trauma, with ensuing emotional harm alone.'" *Armstrong v. Brookdale Univ. Hosp. & Med. Ctr.*, 425 F.3d 126, 137 (2d Cir. 2005) (quoting *Johnson v. State*, 37 N.Y.2d 378, 381, 334 N.E.2d 590, 592, 372 N.Y.S.2d 638, 641 (1975)).

> [Although] physical injury is no longer a necessary component of a cause of action to recover damages for the negligent infliction of emotional distress . . . [t]he circumstances under which recovery may be had for purely emotional harm are extremely limited and, thus, a cause of action seeking such recovery must generally be premised upon a breach of a duty owed directly to the plaintiff which either endangered the plaintiff's physical safety or caused the plaintiff fear for his or her own physical safety.

*Lancellotti v. Howard*, 155 A.D.2d 588, 547 N.Y.S.2d 654, 655 (N.Y. App. Div. 1989) (internal citations omitted). In the

instant case, plaintiff has not pointed to any evidence in the record, nor has the Court found any evidence from which plaintiff could establish that he suffered an emotional injury as a result of a breach of duty owed directly to him that endangered his physical safety. Accordingly, the Court grants summary judgment to defendants on plaintiff's claim of negligent infliction of emotional distress.

### 4. Intentional Infliction of Emotional Distress[18]

In order to assert a valid claim for intentional infliction of emotional distress ("IIED") under New York law, a plaintiff must demonstrate "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of N.Y.*, 78 F.3d 787, 790 (2d Cir. 1996) (citing *Howell v. N. Y. Post Co.*, 81 N.Y.2d 115, 121, 612 N.E.2d 699, 702, 596 N.Y.S.2d 350, 353 (1993)). "New York sets a high threshold for conduct that is 'extreme and outrageous' enough to constitute intentional infliction of emotional distress." *Id.* (citation omitted). The conduct alleged must be "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" *Martin v. Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir. 1985) (quoting *Fischer v. Maloney*, 43 N.Y.2d 553, 557, 373 N.E.2d 1215, 1217,

402 N.Y.S.2d 991, 993 (1978)). "New York courts do not allow IIED claims where 'the conduct complained of falls well within the ambit of other traditional tort liability.'" *McGrath v. Nassau Health Care Corp.*, 217 F. Supp. 2d 319, 335 (E.D.N.Y. 2002) (quoting *Lian v. Sedgwick James, Inc.*, 992 F. Supp. 644, 651 (S.D.N.Y. 1998)). As a result, "IIED claims that are duplicative of other tort claims should therefore be dismissed." *Id.* (citing *Lian*, 992 F. Supp. at 651). Moreover, "New York courts have been very strict in applying these principles." *Martin*, 762 F.2d at 220; *see also Elmowitz v. Executive Towers at Lido, LLC*, 571 F. Supp. 2d 370, 378 (E.D.N.Y. 2008) ("Very few claims satisfy the extreme and outrageous requirement of a IIED claim. In fact, none of the IIED claims considered by the New York Court of Appeals have survived because the conduct was not sufficiently outrageous." (citation omitted)).

Even assuming that all of plaintiff's evidence is true, the alleged conduct is not so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency. *See Martin*, 762 F.2d at 220 (even if plaintiff had established that she was polygraphed by her employer as a result of racial discrimination, such acts "would not provide legally adequate grounds for a verdict of IIED"); *Murphy v. Am. Home Products Corp.*, 58 N.Y.2d 293, 303, 448 N.E.2d 86, 90, 461 N.Y.S.2d 232, 236 (1983) (affirming dismissal of a claim as "fall[ing] far short of [IIED's] strict standard" that alleged that plaintiff was transferred and demoted for reporting fraud at his company, then discharged in a humiliating manner); *Ruggiero v. Contemporary Shells, Inc.*, 160 A.D.2d 986, 987, 554 N.Y.S.2d 708, 708 (N.Y. App Div. 1990) (dismissing claim where the defendant allegedly "harassed and ultimately

---

[18] In his opposition papers, plaintiff does not specifically address defendants' arguments regarding the intentional infliction of emotional distress claim and, thus, it could be deemed abandoned. However, in an abundance of caution, the Court has analyzed the merits of the claim and, in any event, concludes that it cannot survive summary judgment.

discharged the plaintiff due to her pregnancy"). Accordingly, the Court grants defendants' motion for summary judgment on the claim of intentional infliction of emotional distress.[19]

## IV. CONCLUSION

For the foregoing reasons, the Court denies defendants' motion for summary judgment on the claim under Title III of the ADA, 42 U.S.C. § 12182; the claim under the Rehabilitation Act, 29 U.S.C. § 794; and the claim under N.Y. Exec. Law § 296, including the damages issue. The Court grants defendants' motion for summary judgment on plaintiff's other state law claims.

SO ORDERED.

_____

JOSEPH F. BIANCO
United States District Judge

Dated: September 20, 2012
        Central Islip, NY

* * *

Plaintiff is represented by Frederick K. Brewington, Law Offices of Frederick K. Brewington, 556 Peninsula Boulevard, Hempstead, NY 11550. Defendants are represented by Steven G. Storch, Kathleen Elizabeth Wright, and Thomas McKee Monahan, Storch, Amini & Munves, P.C., 140 East 45th Street, 25th Floor, New York, NY 10017.

---

[19] Plaintiff's claim of respondeat superior liability against the College for the tortious acts of its employees Pamintuan, Virasawmi, and Haffner is derivative of plaintiff's state law claims for false arrest, false imprisonment, and intentional and negligent infliction of emotional distress. Because the Court grants summary judgment on each of those underlying tort claims against the individual defendants, the Court also grants summary judgment to defendants on the respondeat superior claim. Additionally, the Court grants summary judgment to defendants on plaintiff's claims under Sections 6, 11, and 12 of Article I of the New York State Constitution. Sections 6 and 12 concern the right to be free from certain actions by New York State, not from private parties like the defendants. *See* N.Y. Const. Art. I, §§ 6, 12. Additionally, although Section 11 has been held to apply to private, as well as state discrimination, it is not an independent source for a cause of action of discrimination under New York law. *See Tarshis v. Riese Org.*, 195 F. Supp. 2d 518, 528 (S.D.N.Y. 2002), *aff'd* 66 F. App'x 238 (2d Cir. 2003).